**S. A. RENICKS, et al., v. CITY OF LAKE WORTH**

18 So. (2nd) 769                                     June Term, 1944
July 11, 1944                                    Special Division B

*Sidney J. Catts, Jr., G. W. Fleenor, Arthur H. Shoupe, L. T. McGee* and *McCoy & Love,* for appellant.

*Mary L. Esarey* and *C. D. Blackwell,* for appellee.

THOMAS, J.:

In 1936 the City of Lake Worth refunded its outstanding indebtedness, evidently incurred between 1914 and 1927, by issuing securities designated "Refunding Bonds, Series A." The city authorities again decided to refund the debt and determined that on 1 August 1943 $3,781,200 remained unpaid, $3,681,900 in the hands of creditors and $99,300 in the possession of a trust company for delivery to the holders of bonds of the original issue in exchange for their securities. Eventually a decree was sought of the circuit judge validating and confirming issuance of the proposed bonds, titled "Refunding Bonds, Series C," and one was entered, but the circuit judge refused to approve bonds of the issue of the par value of $174,000 because some of the "Refunding Bonds, Series A" had been purchased by the city and "in addition, there [were] funds on hand which should be used to discharge Series 'A' bonds." The disparity, then, between the amount of bonds authorized and the amount validated represented the total value of bonds bought by the city and moneys on hand allocable to the payment of other securities of the issue. It is upon appeal by the state and certain property owners from that decree that the case reaches us.

The boundaries of the city were contracted by an Act of the Legislature after the original indebtedness was incurred and before it was refunded, Chapter 14180, Laws of Florida, Sp. Acts of 1929, but in that law it was expressly provided: "That all tax levies and assessment liens made and fixed, and tax sales . . . by the City Commission . . . at any time in the past affecting any of the property formerly within the corporate limits . . . but eliminated by the pro-

visions of this Act, be . . . validated, legalized and confirmed
. . . "; also "those . . . lands, or that . . . territory, within
the corporate limits . . . at the time of the passage of this
Act and eliminated therefrom under the provisions hereof
. . . shall be . . . subject . . . to taxation for the purpose of
bearing their proportionate part of the present bonded in-
debtedness . . . and . . . subject to the . . . liens . . . for local
improvements . . . and the City Commission . . . are em-
powered . . . to enforce such tax and assessment liens . . .
the same as if such lands were still within the corporate
limits of said City. . . ."

So, as we understand the record, all bonds now proposed
to be issued will refund, for the second time, a debt contracted
before the enactment of Chapter 14180, supra.

Oddly enough, despite the provisions we have just quoted,
the resolution authorizing "Refunding Bonds, Series A," 1936,
declared that "all property within the *present* territorial
limits" was subject to taxation to pay the indebtedness in-
tended to be refunded, and the form of the bond imbedded in
the resolution contained a covenant in identical language.
Yet it was recited in the same resolution that the city deemed
it "advisable and necesary to authorize the issuance of Re-
funding Bonds under such terms and conditions as [would]
reserve to the holders thereof the rights, security and
remedies [then] available to them as holders of the City's
. . . outstanding indebtedness"; and further, according to the
form of the bond, the "full faith and credit of said City
[were] . . . pledged."

The question of the issuance of "Refunding Bonds, Series
A" was submitted to the voters residing in the smaller area,
although counsel representing appellants and appellee agree
that no such election was required.

The resolution on which the issue now under considera-
tion is based stipulates that "Taxes sufficient to produce the
sums required for the payment of principal and interest . . .
will be levied upon all property within the present territorial
limits" and states that the "City . . . reserves the right to
levy such taxes upon any property *heretofore excluded* . . .
which was *embraced within the territorial limits* . . . at the

time the indebtedness . . . was originally incurred, and the proceeds of such taxes shall be applied to the payment of the Refunding Bonds to be issued. . . ." The form of the bonds though, as it appears in the resolution, has in it a recital that "This bond is issued . . . for the purpose of refunding valid subsisting funded debt of said City originally incurred prior to November 6, 1934, [This is the identical date given in the resolution authorizing "Refunding Bonds, Series A"] while the City existed with different territorial limits. . . ." There follows a covenant "with the holder . . . that for the payment of the principal and interest . . . it [the municipality] will levy taxes in an amount sufficient to provide therefor *upon all property within the present territorial limits* of said City," and any reference to taxes on the excluded area is omitted.

Adverting to the procedure for "Refunding Bonds, Series A," it had been provided that there should be credited to the interest fund 75% of all taxes then delinquent and all special assessments unpaid to and including the fiscal year 1935-1936. Corresponding provision relative to "Refunding Bonds, Series C" requires that there be paid into a special reserve fund proceeds from special assessments already imposed and taxes unpaid, January 6, 1944, until the amount aggregates "not less than a full year's interest reqirements. . . ."

We believe we have given now in abridged form so much of the history of this complicated transaction as will enable us to decide the questions necessary to be considered, save the one challenging the propriety of a contract with a fiscal agent, with which we shall deal later.

Appellants first insist that the city cannot pledge for payment of the proposed bonds "additional . . . territory not obligated or amenable to taxation for . . . payment of the bonds sought to be refunded." At the outset it is well to repeat that there is no specific pledge of taxes on the excluded territory, the city simply having *reserved the right* to levy upon that region. The question might, therefore, be more appropriately decided upon challenge of any effort in the future to levy a tax on lands formerly in the city to meet payments of principal and interest.

It is patent that the Legislature, when it enacted Chapter 14180, intended that no contraction of the territory over which the town had jurisdiction when the indebtedness was first incurred should be relieved of its share of the burden; that the security of the obligations should not be diminished.

Gist of appellants' argument is that inasmuch as the security of "Refunding Bonds, Series A" was attempted to be restricted to the later and smaller area "Refunding Bonds, Series C" are likewise affected; in other words, that the present issue does not relate to the original obligations, but to the ones which refunded them. They cite to support their position our decision in Town of Davenport v. Hughes, 147 Fla. 228, 2 So. (2nd) 851, but that case is easily distinguishable because there the statute including lands within the municipality had been held unconstitutional, and the opinion was that the lands, having been unlawfully incorporated in the municipal territory, could not be taxed for the payment of the city's bonds. The only other case to which they refer is State v. Citrus County, 116 Fla. 676, 157 So. 4, 7, 97 A.L.R. 431, which interpreted Section 6 of Article IX of the Constitution prescribing issuance of bonds, except refunding bonds, without approval by the freeholders. We said, in the latter, "while a particular class of bonds described as refunding bonds may be authorized by the Legislature to be issued without any vote of the freeholder electorate consenting thereto, the only authority left in the Legislature to provide for the issuance of such refunding bonds without a vote of the freeholders is that power which is limited to a mere authorized extension of the *old* obligation of contract to the new bonds, when the latter purport to be issued 'exclusively' as refunding bonds to be used for the purpose of refunding the *old* bonds or the interest thereon." We have italicized the word "old" because of the importance of its meaning when the pronouncement is applied to the facts in this controversy. Are the old bonds the last refunding bonds issued or the original obligations? We think the latter is the correct construction. No new issue may be launched without approval in an election. Refunding issues may be authorized, but in every case are "a mere . . . extension of the old [or

original] obligation of contract. . . ." In such a situation, the effort of municipalities to refund, the way is hedged on one side by the Constitution of the United States, Section 10 of Article I, so that the security may not be diminished lest the contract between creditor and debtor be impaired. On the other side it is hedged by the Constitution of Florida, Section 6 of Article IX, protecting against an increase of security without voice of the freeholders who must bear part, at least, of the burden. In each instance the path leads directly from the initial bonds to the projected refunding ones. We think that in any procedure to refund the criterion is conformity to the original issue regardless of intervening refunding issues, and that reference to the "old" bonds means the first securities, not the last preceding refunding bonds.

We make these observations without regard to the possibility of a bondholder's placing himself in a new position by the acceptance of a bond of lessened security. No such situation is presented here, and, as we have pointed out, "Refunding Bonds, Series A" to the amount of nearly $100,000 have not been exchanged.

The next question which we think should be determined involves the provision for the reserve fund created from past due taxes and unpaid special assessments. Appropriation of special assessments in this manner does not appear to be invalid, Section 132.21, Florida Statutes, 1941, and F.S.A., nor do we find the inclusion of taxes improper, Section 132.17 et seq., Florida Statutes, 1941, and F.S.A., excepting, however, taxes not levied for debt service, which item should be eliminated from the provision in the resolution, in view of our holding in State v. City of Venice, 147 Fla. 70, 2 So. (2nd) 365, 367, which apparently confined the application of Section 132.17, supra, so far as it relates to taxes due and unpaid, to those *"levied for debt service."*

The last three questions posed by appellants may be consolidated and condensed: "May a taxing unit, as part of its validation proceeding, validate a contract with a bond agent" which (1) evinced abuse of discretion on the part of the commissioners, (2) was indefinite, (3) was prohibited by city charter? There is no need to dwell upon these matters

because no effort was made to confirm the agreement, and the circuit judge expressly held: "Whether or not the contract between the City and its fiscal agent is a valid one, cannot be determined in this proceeding. See State v. Northeast Tampa Special Road and Bridge District." In the cited case, found in 148 Fla. 14, 3 So. (2nd) 481, it was merely stated on this point that the contract with a fiscal agent was not before the court, hence would not be judged. The authority mentioned, State v. Sarasota County, 118 Fla. 629, 159 So. 797, is, however, enlightening here. In that decision it was said an independent arrangement between the issuing body and a refunding agency not made a part or condition of the obligation to the bondholders could not be attacked collaterally in a proceeding to validate. We think the rule was properly invoked by the circuit judge. The contract was not sought to be validated, was expressly not validated, and could not appropriately have been adjudicated in this litigation.

Regardless of the inconsistencies and ambiguities apparent from a study of the statement of fact, we have found no fundamental error except that part of the resolution for the deposit in the reserve fund of delinquent taxes levied for purposes other than service of the debt. On all other questions, so presented that we could entertain and decide them, we rule against appellants.

It is our view that the terms of the resolution anent the deposit of taxes may be revised without disturbing the whole plan. See Andrews v. City of Winter Haven, 148 Fla. 144, 3 So. (2nd) 805; Taylor v. Williams, 142 Fla. 402, 195 So. 175.

The cause is, therefore, reversed with directions to revise the final decree only to the extent of providing for validation and confirmation of the bonds when the objectionable feature is deleted from the resolution.

Reversed.

BUFORD, C. J., BROWN and CHAPMAN, JJ., concur.